## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

Gene Victor Moore, )    Civil Action No. 2:17-cv-3228-RMG
)
        Plaintiff, )
)
v. )    **ORDER AND OPINION**
)
BPS Direct, LLC, Bass Pro, LLC, Global )
Manufacturing Company, LLC, G.M.C., )
LLC, and Mainstream Holdings, Inc., )
)
        Defendants. )
_____ )

Before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 77) and Plaintiff's Motion for Partial Summary Judgment as to certain affirmative defenses. (Dkt. No. 82.) For the reasons set forth below, the motions are granted in part and denied in part.

## I.    Background

This is a products liability case arising out of an injury sustained by Plaintiff Gene Victor Moore allegedly from use of an API Crusader Climbing Treestand ("Crusader Treestand") manufactured by Defendants Mainstream Holdings, Inc. and Global Manufacturing Company, LLC and sold by Defendants BPS Direct, LLC and Bass Pro, LLC ("Bass Pro Defendants"). (Dkt. No. 53.) The Bass Pro Defendants own the trademark for the API brand of treestands, which includes the Crusader Treestand at issue here. (Dkt. No. 94-2 at 13 – 14.) Defendant Bass Pro, LLC is the corporate entity, whereas Defendant BPS Direct, LLC handles direct and internet sales. (*Id.* at 10 – 11.) Bass Pro sells API treestands and sold the Crusader Treestand at issue here to Plaintiff. (*Id.* at 13; 94-3 at 40.) However, while Bass Pro owns the API trademark and sell the products, Bass Pro has entered manufacturing agreements, first with Worldwide Industrial Corporation ("WIC") and in 2014 with Defendant Global Manufacturing Company, LLC

("Global") to manufacture the API treestands. (Dkt. Nos. 94-3 at 26; 94-4 at 59 – 60.) Defendant

Mainstream Holdings, Inc. ("Mainstream") is the parent company of Defendant Global. (Dkt. No.

94-4 at 262.)

The facts underlying this case are largely undisputed. The Crusader Treestand is a climbing

treestand used for hunters to hunt from a tree. (Dkt. No. 77-18.) The Treestand is made up of two

parts: a seat section and a foot section, both of which are secured to a tree by a steel chain and bark

biters. (*Id.* at 10.)



(*Id.*) The hunter's feet are attached to the foot section by a strap, and to use the Treestand the

hunter moves up the tree by alternating between lifting the seat section and setting in the bark

biters into the tree and then lifting the foot section and setting the bark biters into the tree. (*Id.* at

15 – 16.) The hunter repeats this process until the hunter reaches their desired hunting height.

(*Id.*) Importantly, the Treestand's instructions state that a connector rope must be attached between

the seat section and foot section of the Treestand prior to climbing. (*Id.*) Further, the instructions state that a hunter must be wearing a fall arrest safety harness attached to the tree prior to climbing. (*Id.*) The tether attaching the harness to the tree is moved up while the hunter climbs the tree. (*Id.*)

In addition to the instructions on use, both the instructions and separate warning labels advise the hunter of the need to wear a full body harness at all times when using the product, that the Treestand has been tested to use with a maximum weight capacity of 300 pounds and that a hunter must read and follow all instructions and warnings and that failure to do so "may result in serious injury or death." (*Id.* at 4; Dkt. No. 77-16.) The Treestand is packed with a full body safety harness, and the Treestand instructions include detailed instructions and warnings regarding harness use. (Dkt. No. 77-3 at 14; 77-18 at 5 – 7.) These warnings are also included on a safety DVD included with the Treestand. (Dkt. Nos. 77-18 at 10; 77-15 at ¶ 43.)

Plaintiff purchased the Crusader Treestand on November 30, 2014 from Bass Pro online. (Dkt. No. 77-8 at 14.) After purchase, Plaintiff used the Crusader Treestand a number of times in 2014 and 2015 without incident. (*Id.* at 21.) On November 8, 2015, Plaintiff was hunting in Illinois. (*Id.* at 6.) When Plaintiff began climbing the tree he was wearing a safety harness, but he did not connect it to the tree.[1] (*Id.* at 24.) Instead, Plaintiff intended to climb to his preferred height on a tree and only then secure his harness to the tree. (*Id.*) While Plaintiff did not have his safety harness attached the tree, he testified that he did connect the seat section to the foot section with a connector rope and that it was "tethered all the time."[2] (*Id.* at 24, 27.) Plaintiff began

---

[1] On the day of the incident, Plaintiff was not wearing the harness included with the Crusader Treestand, and instead was wearing a safety harness from Hunter Safety System. (*Id.* at 12.) The harness he was using also included warnings that failure to use could result in injury or death, and was rated for up to 300 pounds. (*Id.* at 18; Dkt. No. 77-4 at ¶ 12.) Regardless, the harness was not strapped to the tree. (Dkt. No. 77-8 at 24.)

[2] Defendants dispute this fact, contending that evidence indicates that the seat section and the foot section were not properly attached with a connector rope, possibly by a failure to tie the rope at

climbing up the tree, and once he was about eighteen to twenty feet up on the tree he decided to throw the rope for his safety harness towards the tree in order to secure his safety harness. (*Id.* at 26 – 27.) As he was throwing the rope for his safety harness, the foot section of his Treestand "felt like it slipped or it moved" and fell approximately a foot to two feet. (*Id.*) Plaintiff began to free-fall with the foot section no longer attached to the tree. (*Id.*) The foot section reconnected to the tree, either from the bark biters reengaging or from the connector rope, and was tilting at a steep downwards angel. (*Id.* at 28.) After the foot section reengaged, Plaintiff had his left hand on the seat section and the Treestand collapsed, and Plaintiff "rode both the top and bottom portion of the treestand all the way back to the ground."[3] (*Id.* at 28 – 29.) At the end of the incident, "everything c[ame] to the ground." (*Id.*)

It is undisputed that the Crusader Treestand here had a small "burn hole" that was caused by the welding process that was not part of the design of the Crusader Treestand. (Dkt. Nos. 77-10 at ¶ 17; 77-3 at 60.) This hole was a "not uncommon" by-product of welding. (*Id.*) While prior model of Crusader Treestands included holes in the foot sections for a heel cord, the 2014 Crusader Treestand used by Plaintiff did not include that in the design. (Dkt. No. 77-3 at 41.)

Plaintiff alleges that this hole caused the Crusader Treestand to fail on November 8, 2015, and further faults the weight rating standards used by Defendants during the design process. (Dkt. No. 53.) Plaintiff claims these failures proximately caused his injuries, and brings claims for strict products liability, negligence, breach of warranty and a claim under the South Carolina Unfair

---

the proper location. (*See* Dkt. No. 77-4 at ¶ 15, "A shorter black rope was tied to the left perimeter beam of the seat frame, likely as the connector rope/tether between the foot platform and seat frame (although not at the location specified by the manufacturer)."; Dkt. No. 77-15 at ¶ 55, "[Plaintiff] did not properly connect the top and standing platforms with the supplied connector rope or the two would have been tied together and they were not.")

[3] It is unclear from the record whether Plaintiff's feet remained in contact with the foot section or whether his feet lost contact and, after free-falling, impacted the foot section. (*Id.* at 28.)

Trade Practices Act ("SCUTPA"). (*Id.*)[4] Defendants now move for summary judgment on all four of Plaintiff's claims, and Plaintiff opposes. (Dkt. Nos. 77, 96, 107.) Concurrently, Plaintiff also moves for summary judgment as to Defendants' defenses of contributory negligence, assumption of risk and misuse, which Defendants oppose. (Dkt. Nos. 82, 88, 100.)

## II.  Legal Standard

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, any admissions on file, together with the affidavits, if any, which show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court will construe all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, an issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-movant. *Id.* at 257.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue

---

[4] Plaintiff's claims under the SCUTPA are asserted in the consolidated action, *Moore v. BPS Direct et al*, Civil Action No. 2:18-cv-2017-RMG, Docket Number 1, ¶¶ 63 – 70. (Dkt. No. 68.)

for trial.'" *Id.* at 587. "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank

of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.   Discussion

### A.   Defendants' Motion for Summary Judgment (Dkt. No. 77)

Defendants move for summary judgment on each of the Plaintiff's four causes of action:

strict liability, negligence, breach of warranty and under the SCUTPA, S.C. Code Ann. §§ 39-5-

10, *et seq.*[5] The Court addresses each below:[6]

#### 1.   Strict Liability Claims

As this Court has previously held, as Plaintiff's injury occurred in Illinois, the Court applies

Illinois law to Plaintiff's tort claims, including his strict liability claims. *See Boone v. Boone*, 546

S.E.2d 191, 193 (S.C. 2001). Further, as explained in an Order issued concurrently with this Order,

---

[5] Plaintiff, in their Response, make a standalone argument that the Bass Pro Defendants, Mainstream, and Global were all part of a joint venture. (Dkt. No. 96.) However, Defendants, in their motion, did not seek summary judgment on this point and did not move to dismiss any individual Defendant from the case, except for the strict liability claims against the Bass Pro Defendants. (Dkt. No. 76.) Plaintiff is entitled to make the argument at trial. The Court, however, does note that while Plaintiff conclusorily states that the Bass Pro Defendants were part of a joint venture, his argument focuses exclusively on the relationship between Global and Mainstream, which is likely better analyzed as a corporate or agency relationship based on the evidence in the record. To the extent Plaintiff argues the Bass Pro Defendants were in a joint venture with Defendants Global and Mainstream, that argument is unavailing as there is no evidence of any shared profits or pecuniary interest, required under both the law of Minnesota (place of incorporation for Defendants Global and Mainstream) and Missouri (law controlling vendor agreement between Bass Pro and Defendant Global), and instead their relationship was controlled by a Standard Vendor Agreement that made clear it was for the purchase of products. (Dkt. No. 94-5.)

[6] Concurrent with this Order, this Court has issued an Order on the Parties' pending *Daubert* motions to exclude or limit various expert testimony (Dkt. Nos. 75, 78, 79, 80, 81, 73, 84.) The Court has declined to exclude any of the expert witnesses, though has ruled that some experts' testimony must be limited. This Order therefore relies on the expert testimony deemed admissible by that Order on the *Daubert* motions.

it is undisputed that Defendants BPS Direct, LLC and Bass Pro, LLC sold but did not manufacture the Crusader Treestand at issue, and therefore that claim is barred under the seller's exception to strict products liability in Illinois. This first cause of action, for strict liability, therefore solely applies to Defendants Mainstream Holdings, Inc. and Global Manufacturing Company, LLC.

"Under Illinois law, the elements of a claim of strict liability based on a defect in the product are: (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 543, 901 N.E.2d 329, 345 (2008), *opinion modified on denial of reh'g* (Dec. 18, 2008). Under this test, Illinois recognizes "three theories of strict product liability: manufacturing defect, design defect, and failure to warn." *Id.* at 548. Plaintiff is proceeding under all three theories. (Dkt. No. 96 at 11.) The Court therefore addresses each.

a.   Manufacturing Defect

Regarding strict liability for a manufacturing defect, Plaintiff contends that the hole creating during the welding process on the Crusader Treestand was a manufacturing defect. First, it is undisputed that the condition, namely the unintended hole, was a result of the manufacturing as Defendants' witnesses acknowledge that the hole was created as a not-uncommon by-product of the welding process. (Dkt. Nos. 77-10 at ¶ 17; 77-3 at 60.) Further, there is no dispute that the welding hole existed at the time the product left Defendants Mainstream and Global's control. The undisputed testimony shows that the Crusader Treestand was shipped directly to Plaintiff in an unopened box. (Dkt. Nos. 77-8 at 14 – 15; 96-6 at 14.) Finally, it is undisputed that Plaintiff suffered an injury, a right pilon fracture, based on the Treestand's failure. (Dkt. No. 77-8 at 4.)

However, both Parties have identified extensive evidence in the record creating a genuine dispute of material fact regarding the second and fifth factors of a manufacturing defect claim,

namely, whether the welding hole made the Crusader Treestand unreasonably dangerous and whether the Plaintiff's injury was caused by the defect. When assessing whether a manufacturing defect made the product unreasonably dangerous, Illinois courts apply the consumer expectation test, which provides that "a plaintiff may prevail if he or she demonstrates that the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 256, 864 N.E.2d 249, 256 (2007). Plaintiff has presented record evidence that an ordinary consumer would not expect the foot stand of the Crusader Treestand to break, even if subjected to greater than tested-for dynamic loads.[7] Specifically, Plaintiff's mechanical engineering expert, Dr. Jahan Rasty, opines in both his Report and his deposition that the presence of the hole resulted in a 40% reduction in fracture strength of the Treestand, with the Treestand without the hole able to withstand 2,380 pounds of work-energy, whereas the Treestand with the hole was only able to withstand 1,425 pounds of work-energy. (Dkt. No. 96-5 at 28.)[8]

Defendants make much of the fact that Plaintiff failed to wear his safety harness. Yet, these defenses do not act as an absolute bar to Plaintiff's recovery in his strict liability claims, and instead are only relevant to apportionment of damages. *See Coney v. J.L.G. Indus., Inc.*, 97 Ill. 2d 104, 119, 454 N.E.2d 197, 204 (1983) ("However, the defenses of misuse and assumption of the

---

[7] Dynamic loads are instances where the force applied to the Crusader Treestand is changing, such as by a weight falling on it. However, the industry standards from the Treestand Manufacturers' Association (TMA), by contrast, only test based on static loads, or stable, unchanging weights. (Dkt. No. 96-5 at 24; 96-6 at 31.)

[8] Defendants' expert, George Saunders, contends that the Treestand failed because of Plaintiff's failure to attach the foot section to the seat section and failure to wear his harness, which allowed dynamic loading to the foot section after it slipped down the tree. Saunders contends the welding hole had no substantial effect on the weight bearing capacity of the Treestand and did not lead to the failure here. (Dkt. No. 77-4.) This dispute, between Dr. Rasty and Saunders, is a dispute of material fact which must be submitted to a jury.

risk will no longer bar recovery. Instead, such misconduct will be compared in the apportionment of damages."). Furthermore, as an independent basis for finding that there is a dispute of material fact regarding an unreasonably dangerous condition, regardless of whether Plaintiff was using the Treestand improperly, there is record testimony from a representative of the Treestands Manufacturers' Association, John Louk, that it is foreseeable that hunters regularly do not wear their safety harnesses and that hunting accidents review whether a treestand slipped off the tree. (Dkt. No. 96-14 at 20 – 21, 26.) Therefore, there is record testimony that the product failed to perform, by slipping and breaking, when used in a reasonably foreseeable manner.

Finally, there is ample evidence creating a dispute of material fact regarding whether the small welding hole caused the Plaintiff's injury. Dr. Rasty opined extensively that the hole caused the Treestand to fail here. (*See, e.g.,* Dkt. No. 96-4 at 8, "What caused the failure – was a manufacturing defect that was within the … railing."). The Plaintiff has also presented physical evidence of the Crusader Treestand at issue, showing that the fracture in the Treestand occurred directly through the allegedly defective welding hole. (Dkt. No. 96-5 at 20.) While Defendants dispute this evidence strongly through their own experts, there is a dispute in the record regarding whether a manufacturing defect, namely an unintended welding hole in the foot section of the Crusader Treestand, caused Plaintiff's injuries here. Therefore, summary judgment is denied on Plaintiff's manufacturing defect strict liability claim.

### b.     Design Defect

Plaintiff claims that the Crusader Treestand was defectively designed as the Treestand was design with a Factor of Safety (FOS) of 2, meaning it is designed to withstand double rated capacity of 300 pounds, whereas for it to be safe it should have been designed to a FOS of 4, meaning that it would be able to withstand four-times the rated capacity, so that it could withstand foreseeable dynamic loads. (Dkt. No. 96 at 20.) As above with manufacturing defects, it is undisputed that

the alleged design defect regarding the FOS is a condition of the product as a result of manufacturing or design, that it existed at the time the product left the Defendants' control, and that the Plaintiff was injured. Further, while Defendants have also presented a multitude of testimony and evidence regarding the safety of the design of the Crusader Treestand, Plaintiff has identified at least some limited evidence in the record indicating that a FOS of 2 is unreasonably dangerous.[9] Namely, while the TMA standards only required a FOS of 2, Defendant Mainstream's own Quality Assurance Program required a FOS of 4 for certain treestand components. (Dkt. No. 96-9.) Further, Dr. Rasty opines that Treestand should have been designed with an FOS of 4, based in part on Defendant Global's own Quality Assurance Program, and that this higher FOS was particularly important as dynamic loads, which deliver greater magnitudes of force than static loads, are foreseeable on climbing treestands.[10] (Dkt. No. 96-5 at 30.)

---

[9] When assessing whether a product is unreasonably dangerous based on a design defect, rather than a manufacturing defect, Illinois courts permit claims to proceed under two theories: the consumer-expectation test, as described above, and the risk utility test. Under the risk utility test, "a plaintiff may prove a design defect by presenting evidence of the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 862 (N.D. Ill. 2017) *citing Winters v. Fru–Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007).

[10] Defendants vociferously argue that the Crusader Treestand conformed to, and exceeded, applicable TMA industry standards, both with or without the hole. (Dkt. No. 77-1 at 21, 29 – 30.) However, compliance with industry standards is not a shield to liability in either a strict liability or negligence cause of action, and therefore the Court may still assess whether Plaintiffs have created a dispute of material fact regarding unreasonable dangerousness. *Wille v. Navistar Int'l Transp. Corp.*, 222 Ill. App. 3d 833, 841, 584 N.E.2d 425, 430 (1991) (compliance with industry standard is one factor, among multiple, in products liability case); *Walker*, 288 F. Supp. 3d at 861 ("mere compliance with minimum industry standards is, at most, some evidence to be considered and is not a shield to liability.") *quoting Spiconardi v. Macy's E., Inc.*, 83 A.D.3d 472, 473 (N.Y. App. Div. 2011); *Carrizales v. Rheem Mfg. Co.*, 226 Ill. App. 3d 20, 37, 589 N.E.2d 569, 581 (1991) ("Because we recognize that possibly lagging industry standards should not allow a manufacturer to escape liability for negligent design, we examine whether plaintiff has sufficiently pleaded in the alternative that defendant knew or should have known, in the exercise of ordinary care, that its product was unreasonably dangerous and failed to warn of its dangerous propensity.").

However, Plaintiff has failed to create any dispute of fact that the identified alleged design defects were the proximate cause of the Plaintiff's injury. "Proximate cause encompasses two requirements: cause-in-fact and legal cause.... If multiple factors have combined to cause an injury, Illinois law asks whether the defendant's conduct was a 'substantial factor' in bringing about the injury." *Malen v. MTD Prod., Inc.*, 628 F.3d 296, 309 (7th Cir. 2010) (citations omitted). "For cause-in-fact, the Court must ask 'whether the injury would have occurred absent the defendant's conduct.... To establish legal cause, Plaintiff must show that 'the ultimate injury was reasonably foreseeable,' which 'is satisfied by proof that a reasonable person could foresee that his conduct could lead to the injury complained of.'" *Walker*, 288 F. Supp. 3d at 856 (citations omitted). "Proximate cause is not established, however, where the causal connection is 'contingent, speculative or merely possible.'" *Mengelson v. Ingalls Health Ventures*, 323 Ill. App. 3d 69, 75 (2001). "While proximate cause is ordinarily a question for the trier of fact, it becomes a question of law where there is no material issue of fact regarding the matter or only one conclusion is clearly evident." *Kleen v. Homak Mfg. Co.*, 321 Ill. App. 3d 639, 641, 749 N.E.2d 26, 29 (2001). Here, Plaintiff has failed to identify any evidence creating a dispute of fact and, instead, based on the undisputed evidence, it is evident that Plaintiff cannot draw the necessary causal link between the *design* of the Crusader Treestand and Plaintiff's injury.

Tellingly, as detailed above, Dr. Rasty opined extensively that it was the manufacturing defect, namely the improperly included hole on the foot section of the treestand, that caused the failure. (*See* Dkt. No. 96-4 at 8, "What caused the failure – was a manufacturing defect that was within the … railing."; *Id.* at 9, "I really think that the cause of the accident was the hole, but the design of the…bolt…may have increased the stresses somewhat. But I don't think that was the cause of the accident."; *Id.* at 39, "Why did the stress exceed the strength in this case? And the

reason for that is a manufacturing defect."; *Id.* "Because we tested it with and without it. It broke exactly like the subject. You put a hole in something, it's going to fail at that point.") Dr. Rasty's testing also demonstrated that while the Crusader Treestand would break even without the subject hole, it would withstand significantly higher loads when a hole was not present. (Dkt. No. 96-5 at 28 – 29.) Specifically, Dr. Rasty's tests confirmed that, even without an alternate design with a higher FOS, the Crusader Treestand without a hole would have withstood significantly more work-energy than Dr. Rasty calculated was necessary for Plaintiff, who weighs approximately 200 pounds, to fracture the Treestand's foot section from 7.125 inches.[11] While Dr. Rasty opines that there are alternate designs that may be safer, and may be more consistent with possible dynamic loads on a treestand explicitly used for climbing, Plaintiff has failed to offer evidence that the alleged design defect was the cause of his injuries here as the record evidence instead supports only a dispute of fact regarding whether the welding hole caused the injury here. Plaintiff's argument, based almost exclusively on Dr. Rasty's opinion, *See* Dkt. No. 96 at 22 – 23, instead constitutes nothing more than speculation that the failure to design for dynamic loads and include a FOS of 4 caused Plaintiff's injury. Therefore, Defendants are entitled to summary judgment on Plaintiff's design defect strict liability claim.

### c.    *Failure to Warn*

Plaintiff states he is also asserting a claim for failure to warn. "Under a failure to warn theory, a plaintiff must demonstrate that the manufacturer did not disclose an unreasonably dangerous condition or instruct on the proper use of the product as to which the average consumer

---

[11] Dr. Rasty, based on destructive testing, found that if Plaintiff fell 7.125 inches, he would have delivered a 1,425 pounds of impact energy, sufficient to fracture the foot section. (Dkt. No. 96-5 at 29.)  However, Dr. Rasty also opined that the Crusader Treestand without a hole would withstand 2,380 pounds of work-energy before fracturing. (*Id.* at 28.)

would not be aware*." Salerno v. Innovative Surveillance Tech., Inc.*, 402 Ill. App. 3d 490, 499, 932 N.E.2d 101, 109 (2010). "A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning." *Id.* (citations omitted). Plaintiff here has presented no specific evidence in support of his failure to warn claim, instead asserting a list of eight alleged warnings that Defendants should have included and asking the Court to rely on general recitals of fact unrelated to any allegedly necessary warnings. (Dkt. No. 96 at 24.) Notably, though, the Crusader Treestand included extensive and detailed warnings and instructions. (Dkt. No. 77 at 16 – 19.) Fatal to Plaintiff's failure to warn claim is that he has not demonstrated how any of his requested warnings would have led to his injury being avoided. *See In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2017 WL 1836435, at \*17 (N.D. Ill. May 8, 2017) ("Generally speaking, a plaintiff must show that had the manufacturer provided the warning at issue, the plaintiff's injury would have been avoided."); *Walker*, 288 F. Supp. 3d at 867 ("there is also no evidence from which a reasonable jury could conclude that any failure to warn in this case was a 'material element' or 'substantial factor' in bringing about Plaintiff's injuries.") (citations omitted). Plaintiff seeks multiple warnings, many regarding testing of the Treestand or the need to inspect the Treestand for welding holes. Yet, in addition to the unrebutted evidence of multiple and detailed warnings already being in place regarding proper use of the Treestand, Plaintiff has identified no evidence indicating how the lack of any or all of the warnings were a factor, must less a "substantial factor," leading to Plaintiff's injuries. Summary judgment is therefore granted on Plaintiff's failure to warn claim.

### 2.    Negligence

To make out a negligent product liability claim, the Plaintiff must establish "[1] the existence of a duty, [2] a breach of that duty, [3] an injury that was proximately caused by that breach, and [4] damages." *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 82, 955 N.E.2d 1138, 1153–54 (2011). "A manufacturer has a nondelegable duty to design reasonably safe products." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 270, 864 N.E.2d 249, 264 (2007). To demonstrate negligent manufacturing, a plaintiff must show that the defendant either "deviated from the standard of care that other manufacturers…or, some evidence that [a defendant] knew or should have known, in the exercise of ordinary care, that its product was unreasonably dangerous and failed to warn of its dangerous propensity." *Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821, 830, 557 N.E.2d 580, 586 (1990). *See also Calles*, 224 Ill. 2d at 270 ("A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care") *quoting* Restatement (Second) of Torts § 398, at 336 (1965). Such liability can also extend to a seller. *See Cruz v. Midland-Ross Corp.*, 813 F. Supp. 628, 631 (N.D. Ill. 1993) ("under either theory of liability (strict tort or negligence), a seller of products must occupy a position within the 'original producing or marketing chain' in order to be liable for injuries caused by those products."). *See also Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785, 787 (1975) (imposing liability on suppliers, distributors, wholesalers and retailers "is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product."). Further, a seller has a duty to discover defects causing a product to become dangerous that can be discovered by reasonable inspection. *See Kirk v. Stineway Drug Store Co.*, 38 Ill. App. 2d 415, 429, 187 N.E.2d 307, 313 (Ill. App. Ct. 1963) (

"We believe a fair rule to be applied in such a situation is that if the article, being defective, thereby becomes a dangerous instrument, the seller is required to discover such defects as may be discovered by reasonable inspection and to disclose such defects to the buyer.").

Causation and injury in the negligence action are the same as for strict liability, and therefore, as detailed above, Plaintiff has proffered evidence creating a dispute of material fact regarding causation for the manufacturing defects but not for the design defect or failure to warn. Plaintiff has identified clear evidence in the record that the manufacturing Defendants, Mainstream and Global, knew or should have known that the way in which it manufactured its Crusader Treestands caused the product to be unreasonably dangerous. Most notably, it is undisputed that the Crusader Treestand here had a small "burn hole," and that this was known by the manufacturers as a common by-product of welding. (Dkt. Nos. 77-1 at 14; 77-10 at ¶ 17; 77-3 at 60.) Defendants, remarkably, focus repeatedly on the fact that the burn holes are fairly common, yet this type of repeated and known issue, a hole in the foot section of a Treestand meant for climbing tens of feet up trees which is not intended in the Treestand's design, is precisely the type of evidence that creates a dispute of material fact regarding whether Defendants should have known that these repeated unintentional holes made the Treestands less dangerous.

Notably, in at least one prior case, Defendants also had notice that a Treestand will snap at a hole in a foot stand. Plaintiff submitted a claim by Matthew Vandermast, who purchased a 2013 API Crusader climbing treestand. (Dkt. No, 96-19.) While Vandermast's treestand was produced in 2013 by WIC, a separate manufacturer, the same design ultimately became the basis for the 2014 Crusader Treestand when the manufacturing switched over to Defendants Global and Mainstream. (Dkt. No. 77-3 at 15 – 18; 77-14 at 27.) In the Vandermast case, the design called

for a planned heel cord hole in the foot stand,[12] and Vandermast's treestand split exactly at the heel cord hole while he was simply standing on the product. (Dkt. No, 96-19 at 2, 8.) Vandermast first contacted Mainstream holdings, and next contacted Bass Pro with information regarding the failure. (*Id.* at 15 – 19.) While the Vandermast claim is most striking, Plaintiff submits other evidence as well regarding other instances of failing treestands that were submitted to the Defendants and an expert, Stuart M. Statler, who opined regarding what actions Defendants should have taken in response to these reports of product defects. (Dkt. Nos. 96-11; 96-29.) While the Treestand was produced by a different manufacturer, the record evidence demonstrates it is a similar design and was involved in similar accidents. This evidence of similar accidents in similar products, is admissible to show that the product was defective. *See DiCosolo v. Janssen Pharm., Inc.*, 2011 IL App (1st) 093562, ¶ 26, 951 N.E.2d 1238, 1247 (2011) (evidence of "same accidents in similar product" can be used to show that product was defective); *Bass v. Cincinnati, Inc.*, 180 Ill. App. 3d 1076, 1082, 536 N.E.2d 831, 834 (1989) ("evidence of similar post-accident occurrences or injuries on the same or substantially similar products may be admissible as evidence of the existence of a defect."). These reports to Defendants Mainstream and Global and the Bass Pro Defendants, further create a dispute of material fact regarding whether the Defendants knew or should have known that the manufacturing process of their product, or (as the reports also reached Bass Pro) that the product that they were selling, was unreasonably dangerous.[13]

---

[12] Brent Quiring, a corporate representative for Defendant Global, testified that the design for the 2014 Crusader Treestand at issue here removed the heel cord hole. (Dkt. No. 77-3 at 60, 72; 77-14 at 30.)

[13] The Court also notes that Defendants Global and Mainstream had a quality assurance program indicating that they performed a "quality inspection of each product." (Dkt. No. 96-9; 96-6 at 50.) Further, there is evidence in the record indicating that had the welding hole been discovered during an inspection, it likely should have been removed from sale. (Dkt. No. 96-3 at 25.) It is unclear whether the specific Crusader Treestand was inspected. (Dkt. No. 77-3 at 14.) Finally, the Bass Pro Defendants also do not perform their own inspections, and instead relied on Defendant Global

Defendants, in response, argue that Plaintiff cannot recover for negligence since his misuse of the product, an undisputed failure to wear a safety harness, bars recovery. Defendants rely on *Schwartz v. Am. Honda Motor Co.*, 710 F.2d 378, 381 (7th Cir. 1983) to argue that the "absence of misuse is part of a plaintiff's proof of an unreasonably dangerous condition or of proximate cause." However, Defendants argument is misplaced. *Schwartz* relied on an earlier case, *Illinois State Trust Co. v. Walker Manufacturing Co.*, 73 Ill.App.3d 585, 589 (1979), which subsequently has been clarified after the Illinois Supreme Court's ruling in *Coney v. J.L.G. Indus., Inc.*, 97 Ill. 2d 104, 119, 454 N.E.2d 197, 204 (1983), which made clear that misuse would only "act to reduce a plaintiff's damages, rather than bar the action." *Wheeler v. Sunbelt Tool Co.*, 181 Ill. App. 3d 1088, 1101–02, 537 N.E.2d 1332, 1342 (1989). *See Ocampo v. Paper Converting Mach. Co.*, No. 02 C 4054, 2005 WL 2007144, at *10 (N.D. Ill. Aug. 12, 2005) ("Misuse as an affirmative defense, on the other hand, is a damage-reducer, not a complete bar.").[14]

Therefore, Plaintiff's claim for negligence is not subject to summary judgment.

### 3.    Breach of Warranty

In the first instance, the Court must clarify its prior Order on Plaintiff's motion to file an amended complaint and hold that South Carolina law applies to the breach of warranty claims here. (Dkt. No. 51.) Specifically, while the doctrine of *lex loci deliciti* applies to tort actions, breach of warranty is a contract claim and *lex loci deliciti* does not apply. *See Thornton v. Cessna Aircraft*

---

to inspect, test and remove any nonconforming parts on the treestands. (Dkt. No. 96-25 at 11 – 12.) These facts in the record further create a dispute that require a jury to determine whether Defendants breached their duty to inspect, based both on their own policies and a known incidence of unintended welding holes, to determine whether the products were unreasonably dangerous.

[14] The Court in *Ocampo* did note that misuse could be a complete bar to recovery where it prevents demonstrating causation. However, here, as detailed above, Plaintiff has adduced evidence creating a dispute of material fact regarding whether it was the welding hole, either in totality or primarily, that caused the injuries here.

*Co.*, 886 F.2d 85, 89 (4th Cir. 1989) ("Since a claim for breach of warranty arises under the Code, not general tort liability, the traditional *lex loci delicti* rule does not apply."). Instead, under South Carolina law, for a breach of warranty action, where "a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of another state or nation shall govern their rights and duties. Failing an agreement, this title applies to transactions bearing an appropriate relation to this State." *Id.* at 90 *citing* S.C. Code Ann. § 36-1-301 (formerly cited as S.C. Code Ann. § 36–1–105(1)). It is undisputed that the Crusader Treestand was purchased and shipped to Plaintiff's home in South Carolina. (Dkt. No. 76-9 at 14 – 15.) Therefore, as no party has presented an agreement between the Parties indicating that the laws of another state govern this transaction, South Carolina law applies to the breach of warranty action.[15]

Under South Carolina's Commercial Code, "a seller of [a] product may create an express warranty in a number of ways, including by '[a]ny affirmation of fact or promise, ... made by the seller to the buyer, whether directly or indirectly, which relates to the goods and becomes part of the basis of the bargain.' In addition, '[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.' " *Brooks v. GAF Materials Corp.*, 41 F. Supp. 3d 474, 480 (D.S.C. 2014) *citing* S.C.Code Ann. § 36–2–313(1) (2003). An express warranty cannot be disclaimed. *Id.* To demonstrate an express warranty, a plaintiff must show: (1) the existence of the warranty; (2) breach by the failure of the product to meet the warranted description, and (3) proximate cause of damages from the breach. *First State Sav. & Loan v. Phelps*, 299 S.C. 441, 448, 385 S.E.2d 821, 825 (1989).

---

[15] While the law applicable to the breach of warranty claims is clarified, this Order does not otherwise alter the holding of the Court's Order granting in part and denying in part Plaintiff's motion to amend. (Dkt. No. 51.)

Plaintiff has met its burden to identify evidence creating a dispute of material fact regarding the existence and breach of an express warranty. Plaintiff identifies the "Standard Limited Warranty" included with the Crusader Treestand, which warrants that the Treestand will be "free from defect in material and workmanship for a period of twelve months" and that hardware will be "free from physical defects" for the same period. (Dkt. No. 96-32.) However, the Crusader Treestand here was not free from defects at the time of sale[16] and instead contained a welding hole that did not comport with the design. Further, as described above, Plaintiff has created a dispute regarding whether the defect caused his injuries. Plaintiff's claim for breach of an express warranty is therefore not subject to summary judgment. *See Brown v. Goodman Mfg. Co., L.P.*, No. 1:13-CV-03169-JMC, 2015 WL 1006319, at *3 (D.S.C. Mar. 5, 2015) (claim for express warranty exists based on promise that product would be "free from defects in materials and workmanship that affect performance under normal use and maintenance").

Plaintiff also identifies a warning label which represented that "This product has been thoroughly tested and proper usage and following of guidelines is mandatory for the safety of the user!" (Dkt. No. 96-33.) Plaintiff contends that the Crusader Treestand here was never actually tested prior to sale.[17] (Dkt. No. 77-3 at 25, 45.) A promise that a product has been tested can give rise to an express warranty. *See Royal Bus. Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 42 (7th Cir. 1980) (applying Indiana law based on the UCC, finding express warranty based on "the assertion that the machines were tested and ready to be marketed."). Further, South Carolina law expressly recognizes express warranties created by "affirmation of fact or promise" contained on

---

[16] It was also not free from defects for twelve months from the purchase of the Crusader Treestand on November 30, 2014, as the incident occurred on November 8, 2015.

[17] Defendant Global instead chooses one Treestand of a specific model to send to a laboratory for testing. (Dkt. No. 77-3 at 45.) While it tests the model, there is no indication it performs tests on each product.

"containers or labels." S.C. Code Ann. § 36-2-313(1)(a). Finally, there is record evidence indicating that had this product been tested, it likely would have been removed from sale. (Dkt. No. 77-3 at 26; at 96-3 at 25.) As above, Plaintiff has created a dispute of material fact regarding whether this defect caused his injuries. Therefore, Plaintiff's claim for breach of an express warranty may proceed.[18]

Defendants also seek summary judgment on Plaintiff's claim for breach of implied warranty of merchantability. To make out a claim for breach of the implied warranty of merchantability, a plaintiff must prove "(1) a merchant sold goods; (2) the goods were not 'merchantable' at the time of sale; (3) the plaintiff or his property were injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller." *Brooks*, 41 F. Supp. 3d at 482. As detailed above, it is undisputed that the Defendants sold the goods, there is a dispute of material fact regarding whether the goods were defective, it is undisputed that Plaintiff was injured while using the Treestand, and there is a dispute of material fact regarding whether the breach caused Plaintiff's injuries. Finally, as Plaintiff is alleging personal injuries, no notice was required prior to suit. *See* S.C. Code Ann. § 36-2-607 ("the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; *however, no notice of injury to the person in the*

---

[18] Defendants' argument against the express warranty claim focuses on the assertion that Plaintiff's complaint did not bring a claim for an express warranty in his complaint. (Dkt. No. 77-1 at 30.) However, Plaintiff's Complaint does identify a claim for an express warranty. (Dkt. No. 53 at ¶ 40.) Regardless, if Defendants are challenging the sufficiency of those allegations at this late stage, the motion is controlled by Federal Rules of Civil Procedure 12(c) and 12(h)(2) and not Rule 56, and Defendants have failed to make such a motion here. Finally, a motion under Rule 12(c) must be "early enough not to delay trial." Trial is currently scheduled in this case for August 12, 2019. (Dkt. No. 117.)

*case of consumer goods shall be required.*") (emphasis added); *In re Bausch & Lomb Inc. Contacts Lens Sol. Prod. Liab. Litig.*, No. C/A 2:06-02716-DCN, 2008 WL 2308759, at \*5 (D.S.C. Apr. 9, 2008) (citing S.C. Code Ann. § 36-2-607 and stating that "[s]ome states have adopted ameliorative provisions, relaxing stringent application of the notice requirement where a personal injury is involved.") Therefore, Plaintiff may proceed with his claim for breach of implied warranty of merchantability.[19]

### 4. South Carolina Unfair Trade Practices Act

To make out a claim under the South Carolina Unfair Trade Practices Act, a plaintiff must show that: "(1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006). Plaintiff alleges that Defendants representation that the Treestand had been tested, specifically on the warning label affixed to the Treestand, constituted a deceptive act. The Supreme Court of South Carolina has indicated that an express warranty can constitute a deceptive act which is capable of repetition. *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 524, 381 S.E.2d 906, 908 – 09 (1989) (holding that warranty contained on invoices to customers could support a SCUTPA claim as the "breach of warranty

---

[19] Plaintiff's Complaint also references implied warranties for "fit[ness] for the ordinary purposes" and "fit[ness] for its intended purpose." (Dkt. No. 53 at ¶ 40.) South Carolina recognizes two implied warranties: "(1) the implied warranty of merchantability and (2) the implied warranty of fitness for a particular purpose." *Brooks v. GAF Materials Corp.*, 41 F. Supp. 3d 474, 482 (D.S.C. 2014). Further, where "the particular purpose for which a product is purchased is also the ordinary or intended purpose of the product, the warranties of merchantability and of fitness for a particular purpose merge and are cumulative, such that a plaintiff may proceed upon either theory." *Id.* (citations omitted). Therefore, as no Party has presented any evidence or argument regarding the warranty for fitness for a particular purpose or ordinary purpose, the Court finds that those claims are cumulative and grants summary judgment on those other implied warranty claims.

impacts on the public interest because of the potential for repetition by publication these misrepresentations to other consumers."). It is undisputed that the Treestand contained an express warning that the Treestand "ha[d] been thoroughly tested" and, further, that it was capable of repetition as it was included with the Treestand sold to other consumers as well. Finally, the Plaintiff suffered monetary or property loss from his medical bills and other claimed damages. Therefore, therefore summary judgment is denied as to Plaintiff's claim under the SCUTPA.

### B. Plaintiff's Partial Motion for Summary Judgment (Dkt. No. 82)

Plaintiff's partial motion for summary judgment seeks summary judgment on three of Defendants' asserted defenses: First, Plaintiff seeks summary judgment on all of Defendants' defenses based on Plaintiff's alleged fault; Second, Plaintiff seeks summary judgment on Defendant's assumption of risk affirmative defense; Finally, Plaintiff seeks summary judgment on Defendant's misuse affirmative defense. (Dkt. No. 82.)

Defendants are entitled to present evidence regarding Plaintiff's alleged contributory negligence and fault. Under Illinois law, "whether a claim is based on negligence or strict products liability, an injured party is barred from recovering only if the trier of fact finds that his conduct was more than 50% of the proximate cause of the injury for which recovery is sought." *Malen v. MTD Prod., Inc.*, 628 F.3d 296, 313 (7th Cir. 2010) (citations omitted). Defendant is therefore entitled to submit evidence regarding Plaintiff's alleged fault, such as his failure to secure his safety harness, as Illinois law explicitly will bar recovery if a fact finder determines Plaintiff's actions constituted more than 50% of the proximate cause. Plaintiff is not entitled to summary judgment on this defense.

Turning to two of Defendant's specific defenses, assumption of risk and misuse, it is important to note that, provided a jury does not determine that the Plaintiff actions were more than 50% of the proximate cause of the injury, assumption of risk and misuse do not bar recovery under

-22-

Illinois law, and instead the principle of comparative fault applies such that assumption of risk and misuse may reduce damages. *See Coney*, 97 Ill. 2d at 119 ("However, the defenses of misuse and assumption of the risk will no longer bar recovery. Instead, such misconduct will be compared in the apportionment of damages."); *Malen*, 628 F.3d at313 ("Comparative fault applies so that former defenses such as contributory negligence, assumption of risk, and misuse of the product are merely damage-reducing factors."). Therefore, while the Court will assess whether Defendants can assert these potentially damage reducing defenses at trial, neither will serve as an absolute bar to liability.

Regarding assumption of risk, the defendant bears the burden of proving that "[1] plaintiff knew the product was in a dangerous condition and [2] proceeded to use it in disregard of the known danger." *Cleveringa v. J.I. Case Co.*, 230 Ill. App. 3d 831, 852, 595 N.E.2d 1193, 1208 (1992) (citations omitted). "Assertion of this defense in a product liability suit requires proof that the plaintiff voluntarily and unreasonably proceeded to encounter a known danger…. The test is subjective because what must be considered is the state of mind of the particular plaintiff rather than that of a reasonably prudent person." *Id.* Plaintiff's "age, experience, knowledge, understanding" and "obviousness of the defect and the danger it poses," are all relevant considerations. *Id.*

Here, there is at least some limited evidence creating a dispute of material fact regarding assumption of risk. Notably, the Instruction Manual in this case explicitly warns users to "**ALWAYS** inspect the treestand and all safety devices prior to each use." (Dkt. No. 77-18 at 4.) Further, Plaintiff testified that he read the instructions and warnings for the Treestand at issue and tried to comply with them. (Dkt. No. 77-8 at 13.) *See Boland v. Kawasaki Motors Mfg. Corp., USA*, 309 Ill. App. 3d 645, 654, 722 N.E.2d 1234, 1242 (2000) (finding assumption of risk jury

instruction proper where labels warned of risk). Finally, Plaintiff is a welder, and therefore at least arguably has greater knowledge regarding whether something constitutes an unintended welding hole. (*Id.* at 6.) The evidence that Plaintiff would have had knowledge of the specific defect at issue here is limited, yet the Court is cognizant that "[i]f there is some evidence from which a jury might infer plaintiff's assumption of the risk, then it is within the jury's province to determine that issue." *Id.* Defendants met that standard here, and have proffered some evidence creating a dispute of material fact whether Plaintiff knew of the defect based on the warning label, his statement that he read and attempted to follow the warnings and instructions and his experience. Therefore, Plaintiff is not entitled to summary judgment on Defendants' assumption of risk defense.

Finally, Plaintiff seeks summary judgment on Defendant's misuse defense. "Misuse is the utilization of a product 'for a purpose neither intended nor 'foreseeable' [objectively reasonable] by the defendant.'" *Suich v. H & B Printing Mach., Inc.*, 185 Ill. App. 3d 863, 872, 541 N.E.2d 1206, 1212 (1989). Plaintiff focuses exclusively on the fact that he was purportedly using the product for its intended and foreseeable *purpose*, namely as a climbing treestand, noting that misuse is inapplicable when a product was merely used "in a *manner* neither intended nor foreseeable." *Id.* (emphasis in original). However, Illinois courts have made clear that "a manufacturer is entitled to have its instructions for the use of a product followed by the user….[and a] failure to follow instructions for the use of an object can be a use which is neither reasonably foreseeable nor intended by the manufacturer." *Wheeler v. Sunbelt Tool Co.*, 181 Ill. App. 3d 1088, 1104, 537 N.E.2d 1332, 1343 (1989). Here, it is undisputed that the instructions required users of the Crusader Treestand to wear a safety harness attached to the tree and it is undisputed that Plaintiff failed to attach his safety harness to the tree. Therefore, Defendants are entitled to submit evidence of misuse.

IV.    **Conclusion**

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Dkt. No. 77). The Motion is **GRANTED** as to Plaintiff's claims for a design defect and failure to warn and the Court grants Summary Judgment on those claims. The Motion is otherwise **DENIED**. The Court **DENIES** Plaintiff's Partial Motion for Summary Judgment (Dkt. No. 82).[20]

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

July 8, 2019
Charleston, South Carolina

---

[20] This case has been consolidated with Case No. 2:18-cv-3017-RMG. Defendants' motion here was cross-filed in that consolidated action. This Order also disposes of that motion. (Dkt. No. 38 in Case No. 2:18-cv-3017.)